# In the United States Court of Federal Claims

No. 14-1179 C
(Filed March 3, 2015)[1]

```
* * * * * * * * * * * * * * *    *
RAYMOND EXPRESS                  *
INTERNATIONAL, LLC,              *
                                 *   Pre-Award Bid Protest; No
                                 *   Violation of Statute or
            Plaintiff,           *   Regulation; Adequate Market
                                 *   Research; No Ambiguity in
      v.                         *   Solicitation Price Evaluation
                                 *   Scheme; Rational Test for
THE UNITED STATES,               *   Price Reasonableness.
                                 *
            Defendant.           *
                                 *
* * * * * * * * * * * * * * *    *
```

        *John E. Jensen*, McLean, VA, for plaintiff.  *Alexander B. Ginsberg*, *Travis L. Mullaney*, and *Meghan D. Doherty*, McLean, VA, of counsel.

        *Christopher J. Carney*, United States Department of Justice, with whom were *Joyce R. Branda*, Acting Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Claudia Burke*, Assistant Director, Washington, DC, for defendant. *Ralph J. Tremaglio, III*, Defense Commissary Agency, Fort Lee, VA, of counsel.

———————————————

**OPINION**

———————————————

[1] This opinion was issued under seal on February 13, 2015.  Pursuant to ¶ 4 of the ordering language, the parties were invited to identify source selection, proprietary or confidential material subject to deletion on the basis that the material was protected/privileged. Undisputed redactions were all acceptable to the court.  Disputes over redactions were resolved in favor of plaintiff, because the redacted information in question was not relied upon by the court and the removal of this information does not prevent the reader from understanding the legal issues resolved in this opinion.  All redactions are indicated by brackets ([ ]).

**Bush**, *Senior Judge*.

Plaintiff Raymond Express International, LLC (REI) filed its pre-award bid protest complaint on December 8, 2014 and amended its complaint on December 11, 2014.  In its four-count amended complaint, REI challenges Solicitation No. HDEC09-14-R-0002, a solicitation which has been amended six times.  Some of the amendments were in response to three prior protests brought by REI – an agency-level protest and two protests at the Government Accountability Office (GAO).

The solicitation seeks bids on a contract (or contracts) to provide fresh fruit and vegetables (FFV) to Department of Defense commissaries in South Korea, Japan and Guam (the "Pacific Area").  The soliciting agency is the Defense Commissary Agency (DeCA).  In this protest, REI seeks injunctive and declaratory relief regarding various terms and provisions of the solicitation.

The administrative record (AR) of this procurement was filed on December 19, 2014 and briefing was filed according to an expedited schedule.  Oral argument was held on January 26, 2015.  As discussed below, plaintiff has not shown that the terms of the solicitation violated procurement laws or regulations or were arbitrary or capricious.  Defendant's motion for judgment on the administrative record is therefore granted and plaintiff's motion for judgment on the administrative record is denied.

## BACKGROUND

## I.    Introduction

This protest poses four basic questions:  (1) Does DeCA have the discretion under applicable laws and regulations to change its fresh fruit and vegetables contracting from a model where the contractor procured most items in the United States and had the items shipped at the government's expense to the Pacific Area, to a model where the contractor ships such items at its own expense to DeCA commissaries in the Pacific Area?; (2) Did DeCA conduct adequate market research to support this change in contracting for the Pacific Area?; (3) Is the solicitation unambiguous as to how proposals would be evaluated when certain

produce items were unavailable either locally (in South Korea, Japan or Guam) or globally?; and, (4) Was the price evaluation scheme composed of rational measures with which DeCA could determine the price reasonableness of the proposals?  All of these questions must be answered in the affirmative.  The court offers here a brief discussion of the background facts underlying its analysis.[2]

## II.    Incumbent Contract and FFV Contracts Elsewhere

REI is the incumbent contractor supplying FFV to DeCA commissaries in South Korea, Japan – including Okinawa, and Guam.  The incumbent contract is a small business set-aside.  AR at 3784.  The incumbent contract includes a transportation subsidy, because "[t]he Government [pays] transportation costs from designated points within the United States to the commissary locations located throughout South Korea, Guam, Okinawa and Japan."  *Id.* at 3804.  One effect of the subsidy is to lower the price that patrons of the commissaries in the Pacific Area pay for fresh produce.  *See id.* at 298 (noting that patrons of Pacific Area commissaries "enjoy[] US quality produce at very low prices compared to the local economy in any of the countries").

It is undisputed that the transportation subsidy for the Pacific Area comes at a substantial cost to the taxpayer.  One estimate for the annual cost of the subsidy for REI's contract is $36 million.  Oral Argument Transcript (Tr.) at 25.  DeCA has been able to contract elsewhere for FFV without providing the transportation subsidy, which reduces the costs of the commissary program.  AR at 298, 491 (no transportation subsidy for FFV for commissaries in Alaska, Hawaii and Puerto Rico); Tab 43 (no transportation subsidy for FFV for commissaries in Germany, Belgium and the Netherlands); Tab 44 (no transportation subsidy for FFV for commissaries in the United Kingdom).  With the transportation subsidy removed, the FFV contracts in other regions utilize the delivery term "F.O.B. Destination," where the contractor delivers the produce to each commissary and title to the

---

[2]/  The parties explore a wide-range of topics in their briefing.  Similarly, the administrative record, which includes extensive briefing and exhibits that were submitted for review during the litigation of prior protests, is quite robust.  Although all of the parties' arguments have been considered by the court, this opinion focuses on the issues essential to the resolution of this protest.

goods passes to the government only upon delivery to that commissary. *E.g.*, *id.* at 3889, 3897.

## III.    Acquisition Planning and Market Research

As REI's incumbent contract was nearing its original completion date, DeCA decided the time had come to remove the transportation subsidy from the next Pacific Area FFV contract. AR at 491, 498-99. This decision was founded, in part, on the agency's understanding of the global market for produce. *Id.* at 491 (noting that the F.O.B. Destination business model "takes advantage of the distribution process efficiencies that commercial industry has developed which allows them to offer quality products from their worldwide sources"). DeCA also believed it could replicate, in the Pacific Area, the newer business model's success in other regions such as Europe. *Id.* This belief was founded on market research conducted by a DeCA contracting team based in Germany. *See id.* Tab 4.

The source selection plan was approved on January 30, 2014. AR at 532. Because much of the contract would be performed outside the United States, DeCA removed the small business set-aside requirement. *Id.* at 492. An offeror could bid on all three regions in the Pacific Area (South Korea, Japan and Guam), or could bid on only one or two regions. *Id.* at 497. The contracting period would be for an initial two-year base period, with three option years. *Id.* at 500.

The original schedule called for DeCA to issue a Request for Proposals (RFP or solicitation) in February 2014, make an award (or awards) in June 2014, and have contract performance begin in September 2014. *Id.* at 504. That projected schedule was interrupted and delayed by REI's protests. *See infra*. REI continues to fulfill the FFV needs of the Pacific Area commissaries and will continue to do so through March 31, 2015. *See id.* Tab 41; Pl.'s Mot. Ex. 1 at 4.

## IV.    The Solicitation

Solicitation No. HDEC09-14-R-0002, "Solicitation of Fresh Fruits & Vegetables – Pacific Area," was issued by DeCA on February 3, 2014. AR at 31-204. The produce needs of the commissaries of South Korea, Japan and Guam were divided into distinct Contract Line Item Numbers (CLINs), so that an offeror could submit a proposal for any number of the three CLINs. *Id.* at 33. The

estimated value of the contract was $200 million for the base period and all option periods if an offeror provided FFV for all three CLINs. *Id.* at 288, 293 (clarification provided by Amendment 0001). The F.O.B. Destination contract term was clearly indicated in both the Solicitation itself and in letters sent to potential offerors. *Id.* at 62-63, 206-37.

In its planning for the procurement, DeCA rejected an evaluation system based on price alone, because "price will not be the sole determining factor in selection of the awardee." AR at 502. Instead, the agency recognized that technical proficiency is key to the offeror's success in providing FFV to the Pacific Area commissaries:

> It is essential that the contract awardee has the technical approach to meet the merchandising support, meet or exceed the [Pacific Area] Agricultural Standards, and the other requirements that fall under the technical approach sub-factor. In addition, the contract awardee must be able to meet the inspection requirements, and have a promotional plan to meet the additional support requirements needed. This requirement is a program buy; which means the resulting contract is an all-inclusive commodity contract that provide[s] for the addition of new items as they become available in the marketplace. These additional items will be considered within the scope of the contract and will not require further competition. Evaluation of each sub-factor will include the offeror's participation in technological advancements and its ability to provide products available in the commercial marketplace. The contracting officer must have latitude to make tradeoff decisions between Combined Technical Capabilities/Risk, Past Performance, and Price.

*Id.* at 502-03. In the solicitation, the evaluation system is generally described as "Best Value, Trade-Off." *Id.* at 51. More specifically, the evaluation scheme provides that technical capability is significantly more important than past

performance, and that these two factors, when combined, are significantly more important than price. *Id.*

It is not necessary to review all of the solicitation terms, but a few terms have been highlighted by the parties to this litigation (and in earlier protests brought by REI) and merit mention here. The contractor is required to provide "a full line of quality products available world-wide that is better than, or equal to U.S. . . . Grade #1." AR at 33, 242. Produce must be available for delivery, as a general rule, twenty-four hours after an order has been placed by a commissary. *Id.* at 62, 246. Prices are to be evaluated for reasonableness, and proposals would also provide the government with the opportunity to perform a price realism assessment. *Id.* at 54, 243, 3774. Consumer prices at the commissaries must provide shoppers with at least a fifteen percent discount compared to competing prices at nearby local stores; this discount is known as the Patron Savings Discount, or PSD. *Id.* at 54, 243, 293, 3774.

Offerors were invited to submit questions regarding the solicitation in writing. These questions were answered by Amendment 0001 to the solicitation which was communicated to the offerors on February 24, 2014. AR at 286-92. Various price evaluation terms were clarified during the course of the procurement and will be discussed further in the analysis section of this opinion. Offers in response to the solicitation were initially due by March 19, 2014. *Id.* at 31.

## V.    Offers Received

[ ] offerors responded to the solicitation, but only [ ] proposals were deemed to be responsive. AR Tabs 24-29, 33-38. Of the [ ] responsive proposals, [ ] for Guam only, [ ] for Guam and South Korea only, and the remaining [ ] for all three regions (South Korea, Japan and Guam). [ ].

## VI.    Protests and Related Solicitation Amendments

Some of REI's concerns about the solicitation, and in particular its concerns about the elimination of the transportation subsidy and DeCA's increased reliance on locally-grown produce from the Pacific Area, were expressed in the questions submitted to DeCA and answered by Amendment 0001. *See* AR at 288. Although DeCA provided its answers to the offerors' questions on February 24, 2014,

6

Amendment 0001 was not posted on FedBizOpps until March 4, 2014. *Id.* at 280. Soon thereafter, on March 14, 2014 DeCA extended the deadline for the receipt of proposals until April 4, 2014 by issuing Amendment 0002. *Id.* at 276-77.

On April 3, 2014, one day before the proposal submission deadline, REI lodged an agency-level protest which requested a decision from a level above the contracting officer involved in the procurement. AR Tab 6. The agency-level protest raised many of the issues that must be decided by this court in the subject matter. Proposals were received by the agency on April 4, 2014 as previously scheduled. On May 16, 2014, Mr. Lawrence P. Hahn, the Director of Acquisition Management for DeCA, denied REI's protest. *Id.* Tab 7. Mr. Hahn noted, however, that some of REI's requested clarifications of allegedly ambiguous terms in the solicitation had been addressed by Amendments 0003 and 0004. These amendments issued on March 24, 2014 and May 16, 2014, respectively. *Id.* at 249-75.

Undeterred, REI filed a timely challenge to the solicitation on May 27, 2014 with GAO. AR Tab 8. REI's first GAO protest raised many of the issues that must be decided by this court in the subject matter. When the agency announced corrective action in response to some of the issues raised by REI, this first GAO protest was dismissed as academic on June 25, 2014. Pl.'s Mot. at 12. DeCA's proposed corrective action included clarifying terms of the solicitation and providing offerors with the opportunity to submit revised proposals. *Id.*

Amendment 0005 issued on July 11, 2014 and clarified several terms of the solicitation. AR at 241. This amendment to the solicitation addressed topics which are still in controversy in the subject matter. Amendment 0005 explained when certain High Volume Core Items of produce (HVCI) could be considered to be "not available" for the price evaluation of proposals. *Id.* at 242. This amendment also explained how an offeror could judge whether its proposed produce meets the quality standard of U.S. Grade #1. *Id.* Another clarification was provided as to the delivery requirement for "24-hour Ordering Lead Time." *Id.* Finally, Amendment 0005 addressed the overall evaluation approach for comparing the offeror's prices, including a lengthy explanation of the importance of the Patron Savings Discount, or PSD, as well as the importance of the offerors' accurate understanding of competing local prices that a consumer would pay for produce in the regions of the Pacific Area.

Discussions were apparently opened with the responsive offerors on July 14, 2014.  AR at 240.  On July 16, 2014, DeCA requested revised proposals from the offerors.  Pl.'s Mot. at 12.  Revised proposals were due on July 31, 2014.  AR at 693.  One day before revised proposals were due to be received by DeCA, REI filed its second GAO protest on July 30, 2014.  *Id.* Tab 10.  REI's second GAO protest also raised many of the issues that must be decided by this court in the subject matter.  Revised proposals were apparently received from the five responsive offerors on July 31, 2014.  *Id.* Tabs 33-38; Pl.'s Mot. at 12.

## VII.   GAO Decision and Amendment 0006

REI's second GAO protest was vigorously litigated, but a detailed account of the substance of the parties' positions in that protest serves no purpose here.  The same basic challenges to the solicitation that arose in REI's prior protests and that are carried forth in REI's amended complaint before this court were debated.  Each side introduced declarations and exhibits.  REI commissioned a study from [ ] (hereinafter, [ ] Study) titled "Fresh Fruit and Vegetable Japan and Korea Local Sourcing Feasibility Study" and submitted this study to GAO.  AR at 1385-1503.  DeCA responded with its own declarations and exhibits.  *Id.* at 1308-14, Tab 19.  The documents submitted in the second GAO protest encompass approximately 900 pages.

On that record, on November 6, 2014 GAO sustained two of the protest grounds raised by REI and denied the rest.  AR Tab 39.[3]  REI was not able to persuade GAO that any statute or regulation forbids the elimination of the transportation subsidy for the FFV contract for the Pacific Area.  *Id.* at 3761-64.  Nor did GAO find that DeCA's market research, which confirmed the feasibility of the F.O.B. Destination contracting model for the Pacific Area, was inadequate under the Federal Acquisition Regulation (FAR) or infirm for any other reason.  *Id.* at 3764-65.  GAO's analysis of these two issues is thorough and persuasive.  GAO also brushed aside "numerous" less weighty challenges to solicitation terms that REI had raised in its second GAO protest.  *Id.* at 3761.

---

[3]/ Although the record in this case contains only the sealed, unredacted version of the GAO decision, the public, redacted version of the decision appears to be identical and is available on GAO's website.

GAO agreed with REI, however, that the price evaluation scheme set forth in the solicitation was flawed in two respects. First, GAO identified an ambiguity in the solicitation's description of the method DeCA would use to compare the prices of each offeror's performance:

> We view the evaluation method described by the agency in response to the protest – *i.e.*, using the proposed patron savings discount percentage to evaluate the competitiveness of proposals and using the July 14 "snapshot-in-time" pricing to evaluat[e] price reasonableness and realism – as reasonable. However, it is different from the evaluation methodology in the solicitation in two key respects. First, nowhere does the solicitation state that the evaluation of price is to be based on an offeror's proposed patron savings discount percentage. Second, the solicitation includes a provision that is reasonably interpreted as establishing the July 14 "snapshot-in-time" pricing – rather than the proposed patron savings discount percentage – as the basis of the agency's award decision. Specifically, the solicitation states that "[t]he Government will calculate and evaluate as basis of contract award the total evaluated price for all HVCI for the base period and all option years." RFP, amend. No. 0005, at 4. As illustrated by [REI], evaluating the competitiveness of proposals based on the offerors' unit pricing for the week of July 14 could lead to misleading results because a proposal offering a lower patron savings discount percentage could be evaluated more favorably than a proposal offering a higher patron savings discount percentage.

AR at 3758.

GAO therefore made two recommendations specific to this flaw in the solicitation. First, DeCA should add language if the PSD is intended to be determinative of price competitiveness:

> [I]f it is the agency's intent to evaluate competitiveness
> on the basis of an offeror's proposed patron savings
> discount percentage – as the agency has argued in
> response to this protest – then the agency should amend
> the solicitation to clearly state its intent [to do so.]

AR at 3759.  DeCA should also, to ensure that its intent in this regard is clear, "delete or revise the solicitation provision describing the offerors' HVCI unit pricing as the basis of award." *Id.* at 3759-60.  GAO had no objection to the use of snapshot-in-time price data, as long as the purpose of soliciting this data was to establish a proposal's price reasonableness or price realism:

> [T]he solicitation terms regarding the evaluation of price
> reasonableness and price realism using
> "snapshot-in-time" unit pricing could remain; the
> solicitation simply would be amended to clearly
> communicate that the agency's comparative evaluation
> of the proposals' pricing terms (*i.e.*, the basis for award)
> will be based on the level of an offeror's proposed patron
> savings discount.

*Id.* at 3760 n.7.

On a distinct but related topic, GAO found ambiguity in the solicitation's description of DeCA's evaluation of "an offeror's understanding of . . . how the patron savings discount is applied."  AR at 3760.  Offerors had been warned that their projected minimum PSD would be tested through a comparison of the offeror's snapshot-in-time prices for HVCI and the agency's snapshot-in-time survey of HVCI prices.  If a deviation of plus or minus ten percent separated the agency's calculation of the PSD for that offeror and that offeror's projected minimum PSD, the offeror's price proposal could be rejected as unacceptably inaccurate. *Id.*  According to GAO, however, the language in the solicitation describing the comparison methodology was "unclear" and did not reveal "the agency's intended methodology." *Id.* at 3760-61.

GAO therefore recommended that "the agency amend the solicitation to clarify the provision regarding the evaluation of offerors' understanding of the

application of the patron savings discount." AR at 3761. Once all of these recommended changes to solicitation terms were implemented, GAO also recommended that offerors be permitted to submit revised proposals. *Id.* at 3766. Finally, GAO suggested that DeCA should reimburse REI for its protest costs. *Id.*

DeCA implemented GAO's recommendations by issuing Amendment 0006 on December 1, 2014 and by inviting revised proposals from the [ ] responsive offerors which were due on December 22, 2014. AR Tab 40. This amendment stated that "the government defines 'PRICE' as the Minimum Percentage of Patron Savings for the purpose of proposal evaluation." *Id.* at 3773. Amendment 0006 also changed the snapshot-in-time week for price comparisons to December 8-14, 2014. *Id.* The amendment further stated that DeCA "will analyze the HVCI unit prices provided by offerors for the specified [snapshot-in-time] period for price reasonableness or price realism, however, the HVCI unit prices will not be the basis of contract award." *Id.* at 3774. In addition, proposals would no longer explicitly risk rejection if the offeror's projected PSD varied more than ten percent from the government's calculation of that offeror's PSD. *Id.* at 3775.

In the court's view, DeCA, by issuing Amendment 0006, addressed all of the flaws noted by GAO in the solicitation. REI nonetheless renewed most of its challenges to the solicitation by filing a three-count complaint in this court on December 8, 2014. REI added a fourth count when it filed an amended complaint on December 11, 2014.

## VIII.  Claims Before This Court

Count I of the amended complaint argues that DeCA cannot eliminate the transportation subsidy for the Pacific Area FFV contract without violating certain statutes and regulations. As the court noted *supra*, GAO rejected that contention and the court finds no error in GAO's analysis of this issue. Count II of the amended complaint argues that DeCA's market research was both insufficient pursuant to FAR requirements and not "rationally sufficient." Am. Compl. ¶¶ 85-88. Again, as noted *supra*, GAO rejected REI's challenge to the sufficiency of DeCA's market research and GAO's analysis of this issue is sound.

Count III of the amended complaint suggests that the solicitation terms that explain how "unavailable" produce will be considered in the agency's price

evaluation are ambiguous, arbitrary and capricious.  Finally, Count IV of the complaint contends that the agency's approach to determining the price reasonableness and price realism of proposals is illogical and contravenes various laws and regulations.[4]  The court will, of course, consider all of plaintiff's challenges to the solicitation, whether or not GAO has already covered the same ground.

Revised proposals were received on December 22, 2014.  Pl.'s Mot. at 12; Tr. at 74.  DeCA agreed to suspend its award decision during the pendency of this protest.  The court agreed to issue its decision on the merits no later than February 13, 2015.

## DISCUSSION

### I.   Bid Protest Jurisdiction

This court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or

---

[4]/  Both plaintiff and GAO appear to misread the solicitation as requiring a price realism analysis.  *See* Pl.'s Reply at 23 (mistakenly referencing "the Solicitation's proposed evaluation of the HVCI unit prices for price reasonableness *and* realism") (emphasis added); AR at 3754 (GAO Decision) ("The solicitation stated that the agency *would* evaluate the proposed unit prices as adjusted to include the patron savings discount   for price reasonableness *and* realism.") (emphasis added) (citing Amendment 0005).  The solicitation commits only to a price reasonableness analysis, with a price realism analysis to be conducted at the option of the government.  This is true whether one looks at the text of Amendment 0005, as did GAO, or the revised price evaluation language of Amendment 0006.  *See* AR at 243 ("The Government may also conduct a price realism evaluation . . . ."); 3774 ("The proposed unit prices for the HVCI provided by each offeror *will* be analyzed for price reasonableness . . . .  The Government will analyze the HVCI unit prices provided by offerors for the specified period of time for price reasonableness *or* price realism . . . .") (emphasis added).  Because there is no requirement in the solicitation for a price realism analysis, and plaintiff has not pointed to any FAR requirement mandating that a price realism analysis be conducted in this type of procurement, the court will restrict its analysis of Count IV to an examination of the solicitation's measures for determining price reasonableness.  The court notes, however, that the solicitation terms identifying the data to be submitted to support the offerors' price proposals would, in the court's view, provide sufficient data for an adequate and rational price realism analysis, if DeCA chooses to test the proposals for price realism.

12

proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2012).  The jurisdictional grant is "without regard to whether suit is instituted before or after the contract is awarded."  *Id.*  As a threshold jurisdictional matter, however, the plaintiff in a bid protest must show that it has standing to bring the suit.  *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (*ITAC*); *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (citation omitted).

## II.      Standard of Review for Judgment on the Administrative Record

Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC) provides for judgment on the administrative record.  To review a motion, or cross-motions, under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005).  The court must make factual findings where necessary.  *Id.*  The resolution of RCFC 52.1(c) cross-motions is akin to an expedited trial on the paper record.  *Id.*

## III.     Bid Protest Review

The court first examines whether the plaintiff in a bid protest has standing to bring the suit.  *ITAC*, 316 F.3d at 1319.  An interested party whose direct economic interest in the procurement has been prejudiced by the government's actions has standing.  *Id.* (citing *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (*AFGE*)).  Bid protest standing is limited to those plaintiffs who are "'actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract.'"  *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009) (quoting *AFGE*, 258 F.3d at 1302).  In the context of a pre-award bid protest, a plaintiff must establish that it has suffered or will suffer a "non-trivial competitive injury which can be addressed by judicial relief" to meet the economic prejudice requirement.  *Id.* at 1362.

As the United States Court of Appeals for the Federal Circuit has stated, "the proper standard to be applied [to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2012)]:  a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)).  Under this standard, sometimes referred to as the "APA standard" or the "arbitrary and capricious standard," a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a clear and prejudicial violation of statute, regulation or procedure.  *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085-86 (Fed. Cir. 2001) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001)).  "The arbitrary and capricious standard applicable [in bid protests] is highly deferential." *Advanced Data Concepts*, 216 F.3d at 1058.

*De minimis* errors in the procurement process do not justify relief.  *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996) (citing *Andersen Consulting v. United States*, 959 F.2d 929, 932-33, 935 (Fed. Cir. 1992)).  The bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question.  *Id.* (citing *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed. Cir. 1988)).  Examples of arbitrary and capricious agency action include "when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc. Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (alteration in original).  The court will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (citation omitted).

"'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'" *Honeywell, Inc. v. United States*, 870 F.2d 644, 648

(Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).  If, on the other hand, the protestor has shown a significant error in the procurement process, the court must determine whether that error prejudiced the protestor, because both error and prejudice are required for the protestor to prevail.  *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996) (citing *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996)).  Plaintiff bears the burden of proof to establish prejudice.  *Bannum*, 404 F.3d at 1358.  "Prejudice is a question of fact."  *Id.* at 1353 (citing *Advanced Data Concepts*, 216 F.3d at 1057).

## IV.   Standing

Although defendant has not challenged REI's standing to bring this bid protest, standing is a threshold inquiry that the court must address.  *ITAC*, 316 F.3d at 1319.  As stated *supra*, the protestor must first show that it is an interested party, *i.e.*, that the protestor is an actual or prospective bidder for the contract.  *E.g.*, *Weeks Marine*, 575 F.3d at 1359.  The court notes, at the outset, that REI is an actual bidder in this procurement and is the incumbent contractor.  Because REI is an actual bidder, the first element required to establish standing is satisfied.  *See id.*

Whether REI has suffered a non-trivial competitive injury, the second element of pre-award bid protest standing (which is also referred to as prejudice), *id.* at 1362, is a closer question.  In order to address this inquiry into economic prejudice, the court must first decide whether plaintiff may introduce a declaration for the court's consideration which supports its allegations of prejudice.  This court has often considered such declarations for the inquiry into prejudice.  *See, e.g.*, *East West, Inc. v. United States*, 100 Fed. Cl. 53, 57-58 (2011) (stating that declarations from company officials assist the court in determining whether a protestor has been prejudiced by agency action).  The Declaration of [a senior REI official], Exhibit 1 attached to plaintiff's motion for judgment on the administrative record, is an appropriate submission for this purpose.  Defendant conceded at oral argument that the court may consider [the REI official's] declaration to examine the issue of competitive prejudice.  Tr. at 84.

The proper inquiry into prejudice and standing, in the pre-award context, is provided by *Weeks Marine*.  Several parallels between *Weeks Marine* and this

protest are apparent.  In *Weeks Marine*, the protestor alleged that the challenged solicitation was irrational and that the company was not built to compete under such terms.  575 F.3d at 1360.  Further, the protestor asserted that the solicitation "violated . . . statutes and regulations and lacked a rational basis."  *Id.* at 1361 (internal quotations omitted).  REI makes similar allegations here.

More specifically, the protestor in *Weeks Marine* established that the challenged solicitation, were the procurement to go forward, would likely have a direct monetary impact on the company's bottom line.  *Id.* at 1362.  The Federal Circuit concluded that the protestor had "a definite economic stake in the solicitation being carried out in accordance with applicable laws and regulations."  *Id.*  Here, too, REI has persuasively described the significant economic impacts of the challenged solicitation's terms on its business model.  *See* [REI Official's] Decl. ¶¶ 5-10.  In similar circumstances, the Federal Circuit found that the protestor had established a "non-trivial competitive injury which can be redressed by judicial relief."  *Weeks Marine*, 575 F.3d at 1362.  As in *Weeks Marine*, REI has demonstrated a non-trivial competitive injury and standing to bring its bid protest.  The court now considers whether the record of filings before GAO should be considered to resolve the merits of plaintiff's protest.

## V.   The Scope of the Administrative Record of DeCA's Procurement

The parties have largely focused on the merits of this protest and have not, for the most part, argued that the court should exclude from its consideration documents included within the administrative record or attached as exhibits to the pleadings or the parties' briefs.  The only substantive dispute raised by the parties as to the scope of the record regards the weight to be accorded the [ ] Study, AR at 1385-1503, submitted by plaintiff to GAO, and the rebuttal declarations of Mr. Joseph E. Jeu and Mr. David C. Carey, *id.* at 1308-14, Tab 19, submitted by DeCA to GAO.  *See* Def.'s Mot. at 36-37; Pl.'s Reply at 19-20.  Plaintiff also suggests, in a footnote, that DeCA has attempted to substitute "post-hoc rationalization" presented to GAO for "sufficient[] espress[ions of] its intentions in the Solicitation."  Pl.'s Reply at 20 n.16.

In the court's view, it is appropriate to ignore the parties' submissions to GAO when considering the merits of this bid protest.  First, the bare contemporaneous record of the agency's decision is adequate to resolve all of

16

plaintiff's challenges to the solicitation.  Second, in the court's experience, declarations from the contracting officer and other agency officials may proffer, in many cases, post-hoc rationalization and argument rather than a fact-driven explanation of the agency's decision-making process.  *See, e.g.*, *Sotera Def. Solutions, Inc. v. United States*, 118 Fed. Cl. 237, 263 n.16 (2014) (declining to consider a source selection authority's statements presented to GAO because these contained post-hoc rationalization); *CRAssociates, Inc. v. United States*, 95 Fed. Cl. 357, 377 (2010) (suggesting that a contracting officer's declarations before GAO should be viewed with a "healthy dose of skepticism" so as to not "frustrate effective judicial review under the APA standards"); *cf. Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 911 n.8 (Fed. Cir. 2013) (noting the protestor's objection to the trial court's consideration of the government's submissions to GAO, but declining to decide whether such submissions were "appropriately considered" by the trial court).  Third, REI's [ ] Study was not before the agency when it made its decision regarding the competitive market for providers of FFV in the Pacific Area and its decision to remove the transportation subsidy that had been provided in the incumbent contract.  Thus, the court cannot view the [ ] Study as pertinent under the APA standard of review by which the court must judge the solicitation.  *See, e.g.*, *RhinoCorps Ltd. v. United States*, 87 Fed. Cl. 261, 282 (2009) (declining to consider declarations submitted by the protestor because these "documents proffer facts that substitute plaintiff's opinion for the [agency's] technical determinations").

In certain circumstances, documents submitted to GAO may be considered as the court renders a decision on the merits of a bid protest.  For example, a contracting officer's statement may be needed to explain the record documents or to fill in gaps in the procurement files.  *See, e.g*, *D & S Consultants, Inc. v. United States*, 101 Fed. Cl. 23, 35 (2011) ("The Court may consider explanatory materials that do not offer new rationales for past decisions and that illuminate the methodology the agency employed in making its determination." (citing *CRAssociates*, 95 Fed. Cl. at 376-77 & n.15)).  The administrative record here requires no post-hoc explanation.

Also, where the agency has taken corrective action in a procurement as a result of a GAO protest, documents before GAO may have been considered by the agency as it crafted the corrective action, and may therefore be relevant to the court's review of that agency action.  *See, e.g.*, *Vanguard Recovery Assistance v.*

*United States*, 101 Fed. Cl. 765, 785 n.21 (2011) (considering declarations from agency officials because "those declarations played a role in GAO's First Decision and the ensuing corrective action by" the agency); *Jacobs Tech. Inc. v. United States*, 100 Fed. Cl. 198, 208 (2011) (considering the "contracting officer's statements [in documents before GAO in an earlier protest] pertaining to the initial procurement [because these] may contain information that reasonably informed, and were the basis of, the agency's reprocurement decisions"). Here, on the other hand, the only decisions revisited by DeCA were related to solicitation evaluation terms, not the fundamental issue of whether produce availability in the Pacific Area is sufficient to support the new contracting model embodied in the solicitation. The court therefore concludes that none of the GAO documents in the administrative record are relevant to its review of the merits of this protest.

Plaintiff argues, and the court does not disagree, that the [ ] Study could be considered when the court examines prejudice to REI. Tr. at 75. Defendant argues that documents before GAO are useful in understanding the holding of GAO as it discusses protest grounds that were not sustained by that body. Def.'s Mot. at 36-37; Def.'s Reply at 15. The court agrees with this contention as well. Thus, although the court has not considered, for its determination on the merits, any of the various declarations, memoranda, exhibits, and studies submitted to GAO by the parties, those items have been considered for the limited purpose of determining prejudice to REI and as context for GAO's analysis of various protest grounds advanced by REI.

## VI.    Analysis of the Merits

### A.    Introduction

Plaintiff's predominant factual allegations are that DeCA's elimination of the transportation subsidy will cause unacceptably large price increases for patrons of the Pacific Area commissaries, and that the increased focus on locally-grown produce in the new contract will offer patrons FFV that are unacceptably lower in quality, availability and safety. Neither of these allegations is supported by the administrative record. First, as to the prices patrons will pay for FFV in the Pacific Area, DeCA informed offerors that "DeCA is aware that the cost of the [FFV] products will increase." AR at 288.

Plaintiff appears to argue that DeCA is constrained to keep prices at the commissaries at approximately the same level as they are under the incumbent contract.  *See* Am. Compl. ¶ 30 (arguing that the [ ] Study concludes that [ ]); Pl.'s Mot. at 30 (condemning DeCA's market research for failing to address obvious concerns about significant price increases); Pl.'s Reply at 16-17 (reiterating plaintiff's concerns about price increases).  The court cannot discern in plaintiff's arguments, however, any statutory or regulatory underpinning which would forbid the next FFV contract in the Pacific Area from raising the prices patrons will pay for FFV.  Further, the solicitation provides price evaluation measures with which DeCA can minimize the price increases for FFV in Pacific Area commissaries. AR at 3773-74.

Plaintiff also condemns the solicitation's increased focus on locally-grown produce, arguing that DeCA fails to understand the limited availability of reasonably priced, good quality, safe FFV in South Korea, Japan and Guam.  The solicitation, however, imposes no minimum percentage of local produce as compared to imported produce for the new contract.  *See* AR at 291.  In the court's view, the solicitation adequately balances a preference for locally-grown produce with a rational alternative of imported produce when imported produce better meets the needs of commissary patrons.  Having addressed plaintiff's speculative factual allegations as to the dire consequences of the new contracting model set forth in the solicitation, the court turns to plaintiff's challenges to the solicitation's terms.

## B.  Transportation Subsidy and Relevant Statutes and Regulations (Count I)

### 1.  Section 2483(b)(5) and Related Regulatory Provisions

The parties vigorously debate whether appropriated funds must be used to subsidize the transportation of produce from the United States to the Pacific Area commissaries.  Certainly, appropriated funds are used in this fashion in the incumbent contract.  Just as certainly, appropriated funds are not used in this fashion in DeCA's European FFV contracts.  As plaintiff conceded at oral argument, there is no commentary in relevant legislative history that is helpful on this issue.  Tr. at 23.

Instead, plaintiff relies on the following language contained in 10 U.S.C. § 2483 (2012):

> Appropriated funds shall be used to cover the expenses of operating commissary stores and central product processing facilities of the defense commissary system. For purposes of this subsection, operating expenses include the following:
>
> . . . .
>
> (5)   Second destination transportation costs within or outside the United States.

10 U.S.C. § 2483(b).  Although the statute does not define "[s]econd destination transportation costs," the plain meaning of this phrase is consistent with a definition which distinguishes a "first destination," such as a centralized Department of Defense facility, and a "second destination," such as an actual commissary.  Defendant argues that it is precisely this interpretation of § 2483(b)(5) that allows DeCA to pay a transportation subsidy in the incumbent FFV contract, and to eliminate the transportation subsidy in the new FFV contract.

"Second destination transportation costs" are defined by regulation, even though these costs are defined more by what they are not, than by what they are.[5] According to Department of Defense Financial Management Regulation 7000.14-R (Oct. 2008) (DoD FMR 7000.14-R):

> First Destination Transportation (FDT) is that transportation required to deliver new, an upgraded model, or recapitalized production items from the manufacturer's plant or source of procurement to the first point of delivery where the Military Service or Defense Agency takes possession and/or ownership of that item. The procurement source, as used herein, is any supplier

---

[5]/  In lieu of regulations codified in the Code of Federal Regulations, pertinent regulatory guidance is provided in Department of Defense Instructions (DoD Instr.) and the Department of Defense Financial Management Regulations (DoD FMR).  Both parties treat these pronouncements as regulatory in nature, as does the court.

> outside the DoD supply system or any DoD industrial
> activity that fabricates new materiel.  The procurement
> source or the first point of delivery may be in the
> Continental United States (CONUS) or overseas.  FDT is
> not applicable to components or items reworked by an
> industrial activity.  In the case where the Government
> accepts the production item at the manufacturer's plant
> or source of production and legally owns the item, FDT
> extends to the first point of delivery for either use or
> storage by the Military Service or Defense Agency.  For
> shipments destined to overseas locations that will enter
> the Defense Transportation System, FDT terminates at
> the port of embarkation (CONUS or overseas).
>
> Second Destination Transportation (SDT) is any
> transportation other than FDT.

Def.'s Mot. App. at A2-A3.  Generally, because first destination transportation
costs are those costs for transportation that brings the item to "the first point of
delivery" where the government takes possession of the item, second destination
transportation costs are incurred by the government to transport (or to have
transported) the item, after delivery has been accepted, to a second location where
it will be used.  Further, the first delivery point may be overseas.  Finally, "[f]or
shipments destined to overseas locations that will enter the Defense Transportation
System," first destination transportation may terminate either in the United States
or overseas.  Thus, overseas transportation of commissary goods may be first
destination transportation or second destination transportation, depending on
where the government takes possession of the item.

According to defendant, these statutory and regulatory directives explain
why the incumbent contract (where DeCA takes possession of REI's FFV in the
United States and then pays for overseas transport to a second destination)
involves second destination transportation costs (which are paid with appropriated
funds pursuant to § 2483(b)(5)), whereas the new contract (where DeCA will take
possession of the contractor's FFV at the Pacific Area commissaries), will involve
only first destination transportation costs (which do not require appropriated funds

pursuant to § 2483(b)(5)).  GAO concurred with the agency's explanation of the relevant statutory and regulatory framework:

> Since the solicitation here provides that the agency takes possession and title of the FF[]V at the commissaries in the Pacific Area, we conclude that the solicitation does not contemplate second destination transportation.  Since the solicitation does not contemplate second destination transportation, we agree with the agency that the provision of 10 U.S.C. § 2483(b) regarding the use of appropriated funds for second destination transportation costs is inapplicable.

AR at 3764.  Although plaintiff attempts to find support for its contrary view of this issue in both § 2483(b)(5) and DoD FMR 7000.14-R, Pl.'s Mot. at 14-17 & n.4, 25-27; Pl.'s Reply at 3-7 & n.2, the court cannot ignore the plain meaning of the statutory and regulatory text.  The court finds no violation of § 2483(b)(5), as explained by DoD FMR 7000.14-R, in the solicitation.

The definition of the terms first destination transportation and second destination transportation provided by DoD FMR 7000.14-R is also referenced in the glossary of Department of Defense Instruction 1330.17 (June 18, 2014) (DoD Instr. 1330.17).[6]  Pl.'s Mot. App. 4 at 6, 57-58.  Plaintiff argues, however, that DoD Instr. 1330.17, Enc. 5, Para. 1 contains a definition of these costs that is *different* from the one endorsed by DeCA, GAO and this court.  Because the agency, GAO and this court have all based their interpretation of these terms on the plain meaning of § 2483(b)(5) and DoD FMR 7000.14-R, plaintiff bears a heavy burden to show that DoD Instr. 1330.17, Enc. 5, Para. 1 rewrites or otherwise alters § 2483(b)(5) and DoD FMR 7000.14-R.  Plaintiff does not meet this burden.

---

[6]/  The court relies on the 2014 version of DoD Instr. 1330.17, as does plaintiff in its reply brief.  The agency's solicitation was challenged in this court on December 11, 2014 when the 2014 version of DoD Instr. 1330.17 was already in effect.  The new version of the instruction was also already in force when the agency issued Amendment 0005 and solicited revised proposals, and when REI challenged the elimination of the transportation subsidy before GAO in late July 2014.  In any case, there are no substantive changes from 2008 to 2014 in the relevant text of this instruction.

DoD Instr. 1330.17, Enc. 5, Para. 1 states in relevant part that:

> (2) Appropriated funds will be used to cover the
> following expenses of operating the commissary
> program . . . .
> . . . .
> (b) **Transportation.**  Second destination transportation
> costs of commissary merchandise, supplies, and
> equipment within or outside the United States to include
> transoceanic movement of goods to and from overseas
> and U.S. sea and aerial ports of embarkation to first
> destination overseas; movement of U.S. and foreign
> goods within foreign areas; and movement of U.S. goods
> between DoD installations.

Pl.'s Mot. App. 4 at 31.  According to plaintiff, DoD Instr. 1330.17, Enc. 5, Para. 1
clashes with the agency's interpretation of "second destination transportation
costs," and the solicitation's F.O.B. Destination delivery term, because it
"unequivocally specifies that second destination transportation includes
transoceanic movement of goods to first destination overseas."  Pl.'s Mot. at 27.
The court disagrees for the following reasons.

First, plaintiff's interpretation of DoD Instr. 1330.17, Enc. 5, Para. 1
conflicts with the only reasonable interpretation of § 2483(b)(5) and DoD FMR
7000.14-R.  Second, DoD Instr. 1330.17 incorporates the definition of the terms
first destination transportation and second destination transportation provided by
DoD FMR 7000.14-R by including these in the glossary of DoD Instr. 1330.17 –
any use of such terms in DoD Instr. 1330.17, Enc. 5, Para. 1 necessarily applies
*that* definition, not some conflicting definition.  Third, a harmonizing reading of
this portion of DoD Instr. 1330.17, Enc. 5, Para. 1, which parallels the underlying
statute, is that this text *only* addresses second destination transportation costs, and
that the reference to "first destination" in the text is not a reference to "first
destination transportation" but to a first stop in the second destination
transportation itinerary of an item of commissary merchandise.[7]  Fourth, the court

---

[7]/  The court does not rely on the government's argument that the term "commissary

(continued...)

must defer to the agency's interpretation of its own regulatory provision if it is ambiguous.  *E.g.*, *Price v. Panetta*, 674 F.3d 1335, 1342 (Fed. Cir. 2012) (citing *White v. United States*, 543 F.3d 1330, 1337-38 (Fed. Cir. 2008)).  Because the court does not find that DoD Instr. 1330.17, Enc. 5, Para. 1 unambiguously defines all overseas transportation of commissary items to be second destination transportation, the court finds no violation in the solicitation of § 2483(b)(5), DoD FMR 7000.14-R or DoD Instr. 1330.17, Enc. 5, Para. 1.

## 2.    Section 2484 and a Related Regulatory Provision

Plaintiff also argues that the solicitation violates 10 U.S.C. § 2484 (2012) and a related regulatory provision, DoD Instr. 1330.17, Enc. 5, Para. 2.  This line of argument is somewhat forced.  Whereas § 2483(b)(5) addresses when DeCA shall use appropriated funds for transportation purposes, § 2484(e) does not address DeCA's use of appropriated funds for transportation but instead addresses the pricing of goods at commissaries.  *Compare* 10 U.S.C. § 2483 (titled "Commissary stores:  use of appropriated funds to cover operating expenses"), *with* 10 U.S.C. § 2484 (titled "Commissary stores:  merchandise that may be sold; uniform surcharges and pricing"); *id.* § 2484(e) (titled "Sales price establishment").  The elimination of the transportation subsidy which REI challenges in the solicitation is more a *cost of operations* term than a *pricing* term, in the court's view.  For this reason, § 2483 more directly bears on the challenge to the solicitation raised by plaintiff in Count I of the amended complaint, and § 2484, if it is indeed relevant to the dispute, has significantly less relevance.[8]

The next problem with plaintiff's reliance on § 2484(e) is that it does not appear to have any applicability to the Pacific Area FFV contract.  In relevant part, the statute states that:

---

[7](...continued)
merchandise" has a special, post-delivery meaning in this regulatory text.  Def.'s Mot. at 29-30; Def.'s Reply at 9-10.

[8]/  Of course, the logical connection between transportation costs and pricing cannot be ignored.  This does not necessarily mean, however, that plaintiff may impose § 2484 and its interpreting regulation upon a claim that fits squarely within the scope of § 2483 and its interpreting regulations.

> (1)  The Secretary of Defense shall establish the sales
> price of each item of merchandise sold in, at, or by
> commissary stores at the level that will recoup the actual
> product cost of the item.
> . . . .
> (3) The sales price of merchandise and services sold in,
> at, or by commissary stores shall be adjusted to cover the
> following:
> (A) The cost of first destination commercial
> transportation of the merchandise in the United States to
> the place of sale. . . .

10 U.S.C. § 2484(e).  The solicitation obviously does not violate § 2484(e)(1), because the F.O.B. Destination delivery term *does* function to "recoup the actual product cost of the item."  *Id.*

Plaintiff relies, primarily, on § 2484(e)(3)(A).  Pl.'s Mot. at 17; Pl.'s Reply at 4-5.  In the court's view, § 2484(e)(3)(A) indicates that first destination transportation costs "in the United States" are passed on to commissary patrons through unsubsidized pricing, and are not paid for by appropriated DeCA funds. Is such a provision incompatible with the court's interpretation of § 2483?  It is not.  Neither statute requires DeCA to pay for first destination transportation costs with appropriated funds.

Is § 2484(e)(3)(A) incompatible with the solicitation?  It is not.  The solicitation addresses *overseas* first destination transportation costs (these will be borne by the contractor); § 2484(e)(3)(A) limits its focus to first destination transportation costs "in the United States."  The most logical reading of § 2484(e)(3)(A) is that it is inapplicable to overseas transportation costs of any kind.[9]  The only other logical reading of § 2484(e)(3)(A) which is consistent with

---

[9]/ Plaintiff, in its reply brief, cursorily suggests that § 2484(e)(3)(A) must be read to define all overseas transportation as second destination transportation, pursuant to the canon of statutory construction *expressio unius est exclusio alterius*, citing the readily distinguishable analysis in *Archuleta v. Hopper*, 773 F.3d 1289, 1295 (Fed. Cir. 2014).  Pl.'s Reply at 4-5 & nn.3-4.  This canon suggests that when a statute expresses or includes one thing, the implication is that the statute excludes the other, or the alternative.  Black's Law Dictionary 701 (10th ed.

(continued...)

§ 2483(b)(5), although it is a strained one, is that commissary prices overseas will be adjusted to reflect actual product cost (without a transportation subsidy) when a contractor delivers "merchandise in the United States" directly to a place of sale such as an overseas commissary.  This alternate reading of § 2484(e)(3)(A) likewise poses no conflict with the delivery terms of the solicitation.  The court sees no violation of § 2484(e) in the solicitation.

Plaintiff's remaining argument regarding overseas transportation costs focuses on DoD Instr. 1330.17, Enc. 5, Para. 2, titled "Sales Price and Surcharge Assessment."  Pl.'s Mot. App. 4 at 33.  The court notes that this instruction's focus is on pricing, not operating costs or the use of appropriated funds for operating costs.  *See supra* note 8 and accompanying text.  The text relied upon by plaintiff, Pl.'s Mot. at 27-28, simply states that:

> Pursuant to section 2484(e) . . . , the sales price of each item of merchandise and services sold in, at, or by commissary stores will recoup:  the actual product cost of the item, commercial first destination transportation of

---

[9](...continued)
2014).  The court does not agree that this canon, or *Archuleta*, is of any applicability here.

The canon is sometimes applied to exclude an unlisted item from the scope of a statute when a limited list of items has been provided.  *See, e.g.*, *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 188 (1978) (refusing to expand the exceptions to the Endangered Species Act beyond those enumerated in the statute) (citation omitted); *Archuleta*, 773 F.3d at 1295 (citing the canon to hold that "no exceptions should be read into [5 U.S.C.] § 7512 beyond the five that Congress specifically created") (citations omitted).  The canon should not be applied, however, "unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it."  *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (citation omitted).  Because § 2484(e)(3)(A) does not appear to contemplate overseas transportation at all, it is not fair to suppose that Congress excluded overseas transportation from the scope of the term "first destination commercial transportation" as that term is used in § 2484(e)(3)(A).

Further, as plaintiff recognizes, Congress has historically treated funding for the transportation of goods for domestic commissaries differently than funding for the transportation of goods for overseas commissaries.  Pl.'s Mot. at 16 n.4.  To infer that § 2484(e)(3)(A) governs overseas transportation of commissary goods is a thesis not grounded in the plain meaning of this statute or in any applicable canon of statutory construction.

> the merchandise in the United States to the place of sale
>
> . . . .

Pl.'s Mot. App. 4 at 33.  Because the text of this instruction merely restates the relevant content of § 2484(e), it is of no more use to plaintiff than the text of the actual statute.  *See supra.*  The court finds no violation of § 2484(e)(3)(A) or its implementing regulatory provision in the solicitation.

### C.     Market Research (Count II)

The amended complaint notes at least three alleged flaws in DeCA's market research:  failing to discover the fact that the transportation subsidy is necessary to support the FFV needs of the Pacific Area commissaries; failing to take into account the high prices of FFV in the Pacific Area; and, failing to understand that requiring twenty-four hour delivery will place an unrealistic dependence on locally-grown produce.  Am. Compl. ¶¶ 21-23, 26-27.  In plaintiff's motion, the alleged flaws in DeCA's market research are criticized as rendering the market research grossly inadequate:

> [I]n the place of any findings on availability, price, quality or safety, DeCA's market research consists instead of describing the steps DeCA took to elicit possible interest in submitting proposals for this requirement.  There is an important difference, however, between finding companies interested in submitting a proposal and determining that the procurement strategy likely will result in the acquisition of produce at acceptable levels of availability, price, quality, and safety.  DeCA's market research fails to address these fundamental subjects.

Pl.'s Mot. at 32.

The court notes, first, that this solicitation seeks fresh fruit and vegetables, not sophisticated body armor or state-of-the-art information technology.  Agencies appropriately vary the type and amount of market research they conduct depending on the items procured.  Second, DeCA has been managing FFV contracts in a wide

variety of settings for over ten years and must be presumed to have a baseline understanding of the need for crafting agreements which will ensure the "availability, price, quality, and safety" of produce.  Third, as noted *supra*, the solicitation favors local sourcing of produce but does not require that contractors abandon imported produce as a means for fulfilling the FFV needs of the Pacific Area commissaries.  The court now turns to REI's specific challenges to the adequacy of DeCA's market research.

Plaintiff asserts that "DeCA violated FAR 10.002(b)(1)(iv)[10] by failing to consider '[t]he requirements of any laws and regulations unique to the item being acquired' – namely the second destination transportation statutes and regulations."  Pl.'s Mot. at 32.  This challenge fails because, as noted *supra*, the solicitation does *not* violate the "second destination transportation statutes and regulations."  The court sees no violation of FAR 10.002(b)(1)(iv) in this procurement.

Plaintiff also asserts that "DeCA . . . violated FAR 10.001(a)(3)(i) because it had no rational basis upon which to draw any conclusions regarding 'sources capable of satisfying the agency's requirements.'"  Pl.'s Mot. at 32.  On the contrary, at least three highly-praised technical proposals were received for each region in the Pacific Area, including REI's proposal and its former subcontractor's proposal.  In the court's view, this fact, as well as the documents provided to substantiate the agency's market research, AR Tab 4, show that DeCA's market research rationally determined that there were sources capable of meeting the FFV needs of the Pacific Area commissaries under the terms of the solicitation.  The court sees no violation of  FAR 10.001(a)(3)(i) in this procurement.

Plaintiff also claims that FAR 10.002(b)(1) was violated by DeCA:

> DeCA's research was not "specific to the item being acquired" – *i.e.*, FF[]V for DoD commissaries in the Pacific Area – for which availability, price, quality, and safety are critical considerations.  Instead, the research

---

[10]/  All citations to the FAR in this analysis section are to the 2013 version of Part 10 in Title 48 of the Code of Federal Regulations.

> merely identified firms [that] may be interested in
> bidding for the work.

Pl.'s Mot. at 32 (quoting FAR 10.002(b)(1)).  The court notes, first, that all of the market research in Tab 4 appears to be specific to "FF[]V for DoD commissaries in the Pacific Area."  *See, e.g.*, AR at 302-03 (noting the goal of replacing the incumbent Pacific Area FFV contract with a new one and listing the market research techniques used in furtherance of this goal); 304-07 (listing companies identified through market research as potential sources, including some which responded to the solicitation and became actual offerors).  Thus, DeCA's market research is in accord with  FAR 10.002(b)(1) and does not violate the terms of that regulation as asserted by plaintiff.

Second, to the extent that REI asserts that the agency was obliged, either by the FAR or by any rational procurement planning process, to consider the "availability, price, quality, and safety" of produce for the Pacific Area commissaries, the court finds the record of the agency's acquisition planning and market research adequate in this regard.  As plaintiff is forced to concede, the agency acknowledged the particular challenges of providing FFV to the Pacific Area commissaries as it implemented its decision to eliminate the transportation subsidy.  *See* Pl.'s Mot. at 31-32 (citing AR at 331, 418, 484).  Just because DeCA's analysis disagreed with the position advanced here by REI (that a transportation subsidy is the only rational way to obtain FFV for the Pacific Area), does not mean that the agency's market research was not "rationally sufficient."  Am. Compl. ¶ 88.  Indeed, the proposals submitted by offerors tended to legitimize the agency's analysis and discredit REI's contentions in this regard.

Finally, plaintiff asserts that

> DeCA's market research violated FAR 10.001(a)(2)(i)
> because it plainly was not "appropriate to the
> circumstances," having failed to consider any of the
> substantive factors relevant to this procurement – and
> having ignored the concerns raised in internal DeCA
> emails.

Pl.'s Mot. at 32 (quoting FAR 10.001(a)(2)).  Apparently, REI interprets FAR
10.001(a)(2) to command that DeCA's market research focus primarily on the
"availability, price, quality, and safety" of produce for the Pacific Area
commissaries, rather than on determining whether the market for potential
contractors for the requirement was adequately robust.  Whatever the logic of this
proposition, a mandate of the focus proposed by REI is nowhere to be found in the
text of FAR 10.001(a)(2).  The court finds no violation of FAR 10.001(a)(2)(i) in
DeCA's market research, which, in the court's view, was appropriate under the
circumstances.[11]

As to the more general question of whether DeCA was obliged to both
identify sources to perform the contract as well as investigate potential challenges
to contract performance as part of its market research, defendant notes that the
agency has substantial discretion in the scope and manner of conducting market
research.  Def.'s Mot. at 31-32 (citing a number of FAR provisions, including
FAR 10.002(b)(1)).  Defendant has also catalogued the solicitation terms which
will aid DeCA in assuring that the "availability, price, quality, and safety"
concerns raised by REI are adequately addressed by the offerors.  *Id.* at 33.
Finally, defendant contends that the positive evaluations of most of the proposals
received show that REI's concerns as to the "availability, price, quality, and
safety" of produce were adequately addressed in DeCA's market research and by
the offerors themselves.  *Id.* at 33-34.

GAO agreed with the agency's position on this issue, and stated that

> [w]hile the record reflects that the agency's market
> research may not have been as expansive as the market
> research commissioned by [REI in the [ ] Study], we
> view it as adequate under the circumstances of this
> procurement.  In this regard, it is evident that the agency
> conducted market research to identify sources capable of

---

[11]/ The agency's market research did not include many of the more formal exchanges
with industry noted in FAR 15.201.  As defendant notes, however, DeCA's market research team
met with two representatives of REI, in accordance with FAR 10.002(b)(2) and FAR
15.201(c)(4).  *See* AR at 338-39.  DeCA clearly did more than merely identify potential sources
for the contract as it conducted market research.

> satisfying the agency's requirement, as described in FAR
> § 10.001(a)(3)(i).

AR at 3765 (citations to the GAO record omitted).  GAO noted, too, that DeCA
has plans to monitor price increases paid by commissary patrons so that these
remain "reasonable," and that the PSD will ensure that patrons pay prices that are
at least fifteen percent below comparable FFV prices in local stores.  *Id.*  The court
agrees with GAO that DeCA's market research in this procurement was reasonable
and did not violate the FAR.

### D.   Unavailable Produce in the Price Evaluation Scheme (Count III)

Count Three of the amended complaint contains a two-pronged challenge to
the solicitation's price evaluation scheme:

> The Solicitation's price evaluation provisions contain
> ambiguous and contradictory statements regarding the
> meaning of "available" FFV.  The Solicitation also
> establishes an illogical scheme for pricing and evaluating
> FF[]V that an offeror determines are unavailable.

Am. Compl. ¶ 37.  Defendant argues in rebuttal that the relevant solicitation terms,
which must be considered together, are not ambiguous.  Def.'s Mot. at 40.  A
logical place to test plaintiff's contentions is the text of the solicitation itself.

High Volume Core Items (HVCI) are thirty-five mainstream produce items
in the typical American diet such as apples, bananas, carrots and tomatoes.  AR at
59, 113-24.  Each offeror must supply price information for its HVCI.  *See id.* at
3774 ("Unit prices are required for each HVCI for each CLIN.").  In general, the
list of HVCI is fixed by the solicitation and the offer of substitute produce may be
reason for elimination of an offeror.  *Id.* ("Proposed alternate HVCI submissions
in lieu of the HVCI stated in the solicitation will be disregarded without the
Contracting Officer's consent.  Failure to provide the HVCI required by the
solicitation may result in removal from further consideration for contract award.").

The solicitation identifies a limited exception to the requirement that an offeror submit prices for *all* HVCI, and the parties appear to agree that this exception would be rarely, if ever, invoked:

> Offerors may identify to the Contracting Officer any HVCI that is not available globally within the specification required by the solicitation. The Contracting Officer will provide final disposition on those HVCI identified.

AR at 3774. Thus, for example, unless an offeror believes that "carrots peeled mini," *id.* at 123, cannot be supplied from any worldwide producer and cannot be priced, that offeror will not seek an exception from the general rule and will provide an HVCI unit price for "carrots peeled mini" as required by the solicitation. This text of the solicitation is not ambiguous.

*Local* availability is addressed by another set of provisions in the price evaluation scheme set forth in the solicitation. These provisions explain that the general methodology for evaluating the logic of an offeror's Patron Savings Discount (PSD) is for DeCA to compare an offeror's HVCI unit prices to HVCI prices in nearby stores in that region. AR at 3774. This price comparison, however, will exclude certain HVCI that are not available in local markets during the snapshot-in-time week:

> If a HVCI is not available on the local economy for the Market Basket Survey during the time 14-20 July 2014 . . . , the item will not be considered for evaluation under the Price Evaluation Factor.

*Id.* at 242. The snapshot-in-time week later is identified by Amendment 0006 as December 8-14, 2014. *Id.* at 3773. Thus, local availability does not affect the requirement that an offeror submit a unit price for all HVCI, it affects the number of items that will be used by DeCA to compare an offeror's unit prices for HVCI to local HVCI unit prices. These solicitation provisions, too, are rational and unambiguous.

Although plaintiff contends that providing HVCI unit prices for locally unavailable produce is naught but "a meaningless exercise" when these unit prices will not be used to evaluate an offeror's price proposal, Pl.'s Reply at 21, the court does not view such an approach as irrational.  As defendant notes, DeCA did not pre-determine local unavailability of produce.  Def.'s Reply at 17.  It is far more logical to sift through each offeror's complete set of HVCI unit prices and weed out those HVCI that have been determined by DeCA to be locally unavailable, than to expect all of the offerors to uniformly identify and price only those items that they believe are available locally.  The court finds nothing arbitrary or capricious in the agency's definitions of available produce in the solicitation, or in a price evaluation scheme that unambiguously takes local availability of produce into account when comparing the offerors' proposals.[12]

### E.    Price Reasonableness Measures (Count IV)

Plaintiff's final attack on the solicitation focuses generally on the price evaluation scheme:

> The Solicitation violates statutory and regulatory requirements because the hypothetical prices of HVCI items that DeCA intends to evaluate for price reasonableness and/or realism bear no meaningful connection to the amounts that will be charged under the contract and provide little insight into an offeror's actual ability to perform or the reasonableness of the cost of the contract.

---

[12]/  The agency's discussion of produce availability evolved from the initial responses it provided to offerors' questions in Amendment 0001.  *See* AR at 288-89.  Amendment 0005, in particular, replaced this earlier guidance.  *See id.* at 242 (noting that this amendment changed the solicitation's terms for "High Volume Core Items (HVCI) and Item Substitution for Market Basket Surveys").  Amendment 0006 further amended the price evaluation scheme.  *Id.* at 3773-78.  As amended, the solicitation contains no ambiguity as to the "availability" of produce or the effect of the availability of produce on the price evaluation of proposals.  To the extent that there theoretically might be some minor lingering ambiguity in the solicitation regarding the availability of produce, such an error would be *de minimis* and would neither prevent offerors from submitting rational price proposals nor prevent DeCA from conducting a rational evaluation of price proposals.

Am. Compl. ¶ 96.  In other words, REI argues that the solicitation's price evaluation methodology "will not meaningfully assess the cost under the contract for any of the offerors."  *Id.*  The court notes that GAO considered DeCA's stated price evaluation approach to be reasonable as long as the solicitation was corrected to clarify how that price evaluation would be implemented.  AR at 3758, 3760 n.7.

In its motion, plaintiff explains that it is not the snapshot-in-time methodology that renders the agency's price evaluation scheme meaningless, but the fact that DeCA refused to supply offerors with its baseline local market basket prices upon which the offerors could calculate their proposed minimum PSD:

> In sum, the Solicitation's price reasonableness and realism evaluation methodology is flawed, illogical, and arbitrary because the HVCI prices will not be calculated from a common baseline.  It could lead to critical miscalculations and the unequal treatment of offerors.

Pl.'s Mot. at 37.  The object of a price reasonableness inquiry is to prevent the government from paying too much for procured items.[13]  *E.g.*, *DMS All Star Joint Venture v. United States*, 90 Fed. Cl. 653, 657 n.5 (2010).  In plaintiff's view, DeCA would only be able to accurately compare the reasonableness of price proposals if each offeror based its proposed PSD on a common baseline local market basket price, rather than on an individually-conducted market basket survey of local prices.  *See* Pl.'s Mot. at 36 ("Without [a market basket survey] equivalent common to all offers, different offerors invariably will start with different perceptions of the market prices, meaning that any evaluation of the resulting proposed HVCI prices will be arbitrary and capricious.").

The court cannot agree with plaintiff's assumptions.  First, plaintiff misunderstands the unit price data each offeror will supply to DeCA.  Each offeror is to communicate both its proposed PSD *and* its local price assumptions for HVCI.  *See* Def.'s Mot. at 45 ("After receiving offerors['] proposed unit prices for the snapshot time period, DeCA will have an understanding of what offerors

---

[13]/  As previously noted, a price realism analysis is not required by the solicitation and the particularities of such analyses need not be discussed further in this opinion.  *See supra* note 4.

perceive to be the local market price upon which they are applying their patron savings discount."). Thus, there will be adequate data for DeCA to avoid reliance on any inaccurate market basket surveys or on any inaccurate PSDs.[14]

Second, offerors commit to a minimum PSD for the base period and the option years of the contract. *See* AR at 3774, 3776-78. The PSD in each proposal therefore allows DeCA to compare the true cost of proposals, because the PSD and fluctuating local market prices, together, will be a good predictor of the cost of contract performance. The relevant text in the solicitation describes the overall approach to determining price reasonableness based on the data provided by the offerors:

> The proposed unit prices for the HVCI provided by each offeror will be analyzed for price reasonableness and the accuracy of the application of the proposed Price (minimum percentage of patron savings). The proposed unit prices for the HVCIs shall reflect the application of the proposed Price (minimum percentage of patron savings) based on market basket survey equivalents conducted during the period 8-14 December 2014 . . . . The Government will analyze the HVCI unit prices provided by offerors for the specified period for price reasonableness or realism, however the HVCI unit prices will not be the basis of contract award.

*Id.* at 3774.

The court views the agency's clarified focus on PSD for its price evaluation, AR at 3772-78, as fundamentally rational and fulfilling the statutory and regulatory requirements cited by plaintiff. Here, despite plaintiff's arguments to the contrary, the price evaluation scheme collects both sufficient and useful data from the offerors and rationally explains how this data will be used to determine

---

[14]/ If DeCA had provided a baseline market basket survey of local prices, as plaintiff suggests, the agency would be forced to accept proposed PSDs largely on faith. There is no advantage to plaintiff's preferred price evaluation method.

the price reasonableness of proposals.  The solicitation's price evaluation scheme violates no laws or regulations and is not arbitrary or capricious.

## CONCLUSION

Plaintiff has failed to show that the solicitation is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Because plaintiff's bid protest has not succeeded on the merits, the court need not consider whether plaintiff has proved prejudicial error on the part of the government and need not inquire further into the factors that might justify injunctive relief.  Accordingly, it is hereby **ORDERED** that

(1)  Plaintiff's Motion for Judgment on the Administrative Record, filed December 29, 2014, is **DENIED**;

(2)  Defendant's Cross-Motion for Judgment on the Administrative Record, filed January 12, 2015, is **GRANTED**;

(3)  The Clerk's Office is directed to **ENTER** final judgment in favor of defendant, **DISMISSING** the amended complaint with prejudice;

(4)  On or before **February 27, 2015**, counsel for the parties shall **CONFER** and **FILE** with the Clerk's Office a **redacted copy** of this opinion, with any material deemed proprietary marked out and enclosed in brackets, so that a copy of the opinion can then be prepared and made available in the public record of this matter; and

(5)  Each party shall bear its own costs.

/s/Lynn J. Bush_____
LYNN J. BUSH
Senior Judge